UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SABAH AKAR, SAWUSAN I. AKAR,   )
T.F., a minor child by her mother and next )
Friend SAWUSAN I. AKAR, N.F., a minor )
child by her mother and next friend, )
SAWUSAN I. AKAR, )
 )
          Plaintiffs, )          CIVIL ACTION
     v. )          NO. 10-10539-NMG
 )
FEDERAL NATIONAL MORTGAGE )
ASSOCIATION a/k/a FANNIE MAE, )
WELLS FARGO BANK, N.A., HARMON )
LAW OFFICES, P.C., NORTHEAST )
ABSTRACT SERVICES, INC. and )
HAMMOND RESIDENTIAL REAL    )
ESTATE, LLC, )
 )
          Defendants. )

## REPORT AND RECOMMENDATION ON
## THE MOTION OF HARMON LAW OFFICES, P.C.
## AND NORTHEAST ABSTRACT COMPANY, INC. TO DISMISS

December 1, 2011

DEIN, U.S.M.J.

## I.  INTRODUCTION

      The plaintiffs, Sabah Akar ("Akar"), her daughter Sawusan I. Akar, and two of

Sawusan Akar's minor children, through their mother and next friend, have brought this

action to set aside the foreclosure sale of Akar's home on February 10, 2009, to enjoin

the present owner from evicting them or charging them for use of the home, and to obtain

damages for injuries suffered in connection with the foreclosure. The plaintiffs allege

that the foreclosure was carried out by defendant Wells Fargo Bank, N.A. ("Wells Fargo"), with assistance from its counsel, defendant Harmon Law Offices, P.C. ("Harmon"), and Harmon's affiliate, defendant Northeast Abstract Services, Inc. ("Northeast Abstract").[1]  The plaintiffs also allege that following the foreclosure, ownership of the property was transferred to defendant Federal National Mortgage Association a/k/a Fannie Mae or FNMA ("Fannie Mae"), which retained defendant Hammond Residential Real Estate, LLC ("Hammond") to act as its property manager and marketing agent.

At the heart of the plaintiffs' claims are their allegations that the foreclosure sale was unlawful because Wells Fargo was not the holder of the mortgage at the time it initiated the foreclosure proceedings, and their allegations that Wells Fargo failed to honor its repeated promises not to foreclose while Akar's application for a loan modification remained pending.  By their Second Amended Verified Complaint, the plaintiffs have asserted thirteen causes of action, which include the following claims against Harmon and Northeast Abstract: claims of wrongful foreclosure (Counts III, IV and VII), intentional infliction of emotional distress (Count XI), and unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A (Count XII); and claims against

---

[1]  According to the defendants, Northeast Abstract's correct name is Northeast Abstract Company, Inc., and it has been improperly named as Northeast Abstract Services, Inc. throughout most of the plaintiffs' complaint.  For the sake of simplicity, this court has referred to the defendant as "Northeast Abstract" throughout this Report and Recommendation.

Harmon only for violation of the Fair Debt Collection Practices Act (Count II), and civil trespass (Count X).

The matter is presently before the court on "Defendants, Harmon Law Offices, P.C.'s and North East Abstract Company Inc.'s Motion [to] Dismiss Under Fed. R. Civ. P. 12(b)(6)" (Docket No. 44), by which Harmon and Northeast Abstract are seeking the dismissal of all of the claims asserted against them for failure to state a claim upon which relief can be granted.[2] Although the plaintiffs have not submitted a written opposition to the motion, they opposed the motion and presented their arguments orally at a hearing before this court on September 28, 2011. After consideration of the defendants' written submission and the parties' oral arguments, and for all of the reasons described below, this court recommends to the District Judge to whom this case is assigned that the defendants' motion to dismiss be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that the motion be denied with respect to Count II, in which the plaintiffs have asserted a claim against Harmon under the Fair Debt Collection Practices Act, but that the motion otherwise be allowed.

## II.  STATEMENT OF FACTS

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all

---

[2] Wells Fargo and Fannie Mae have filed motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12 (c). This court has separately addressed those motions in a Report and Recommendation on Defendants' Motions for Judgment on the Pleadings dated November 16, 2011.

reasonable inferences.  See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir.

1999).  "Ordinarily, a court may not consider any documents that are outside of the

complaint, or not expressly incorporated therein, unless the motion is converted into one

for summary judgment."  Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d

30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the

authenticity of which are not disputed by the parties; for official public records; for

documents central to plaintiffs' claim; or for documents sufficiently referred to in the

complaint.'"  Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).[3]  Applying

this standard to the instant case, the facts relevant to the motion to dismiss are as follows.

### Akar's Purchase of the Property

Akar is a single woman over the age of 60 who has little knowledge of the English

language.  (Compl. ¶ 1).[4]  In August 2006, she purchased a home in Stoughton,

Massachusetts (the "Property"), where she has continued to reside along with her

daughter, son-in-law, and five minor grandchildren.  (Id. ¶¶ 1-2, 42).  In connection with

the purchase of the Property, Akar obtained a loan from Pride Mortgage, LLP ("Pride").

(Id. ¶ 42).  The principal amount of the loan was $300,000, and it had a fixed interest rate

of 7.75%.  (Id.).  The loan was evidenced by a note and secured by a mortgage, which

---

[3] Consistent with the relevant standard, this court has considered documents attached to and referenced in the Second Amended Complaint.

[4] "Compl." refers to the plaintiffs' "Second Amended Verified Complaint and Demand for Jury Trial" (Docket No. 33).

was signed by Akar.  (See Compl., Ex. 2).  According to the plaintiffs, Pride never verified Akar's employment or income, and failed to determine whether she could afford the Property.  (Id. ¶ 42).  Allegedly, the monthly mortgage payment, including taxes and insurance, was over $3,400.  (Id.).

The mortgage identified Akar as the "Borrower," Pride as the "Lender," and Mortgage Electronic Registration Systems, Inc. ("MERS"),[5] "a separate corporation . . . acting solely as a nominee for Lender and Lender's successors and assigns" as the mortgagee.  (Compl., Ex. 2 at p. 1).  The mortgage also provided in relevant part that in the event of a default that is not cured within a specified time, the "Lender, at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law."  (Compl., Ex. 2 ¶ 22).  The foreclosure giving rise to the plaintiffs' claims in this action occurred after Akar defaulted on her

---

[5]  "[T]he MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages.  Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages.  Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.  The initial MERS mortgage is recorded in the County Clerk's office with 'Mortgage Electronic Registration Systems, Inc.' named as the lender's nominee or mortgagee of record on the instrument.  During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system.  In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage."  MERSCORP, Inc. v. Romaine, 8 N.Y.3d 90, 96, 828 N.Y.S.2d 266, 268, 861, N.E.2d 81, 83 (2006) (footnotes omitted).

$300,000 loan and Wells Fargo invoked the statutory power of sale under the mortgage agreement.

The plaintiffs allege that Akar entered into a second mortgage loan with Pride, which consisted of an $80,000 equity line with a fixed interest rate of 12%, and a balloon payment of $69,000 that was never disclosed by the lender. (<u>Id.</u> ¶¶ 43-44). Although the foreclosure at issue in this case does not concern the second mortgage, the plaintiffs claim that Pride never warned Akar about the true costs of the Property. (<u>Id.</u> ¶ 43). According to the plaintiffs, the two mortgages together had a loan to value ratio of 95%, and they did not qualify for private mortgage insurance that would have protected the lender. (<u>Id.</u>). However, the plaintiffs have not alleged that any of the defendants named in this action were involved with the origination of the loans or had any relationship with Pride.

### Circumstances Leading up to Foreclosure of the Property

The plaintiffs allege that in the fall of 2006, shortly after Akar purchased the Property, Akar was involved in an automobile accident that rendered her unable to work. (<u>Id.</u> ¶ 65). Akar did not receive disability insurance, and had no other source of income. (<u>Id.</u>). The plaintiffs claim that on about January 12, 2007, Akar received a notice stating that Ohio Savings Bank had transferred the servicing of her loan to Wells Fargo Home Mortgage. (<u>Id.</u> ¶ 45). The notice did not indicate whether ownership of the loan had been transferred at that time as well. (<u>Id.</u>).

On about April 22, 2008, Harmon allegedly sent a letter to Akar in which it informed her that it had been retained by Wells Fargo to foreclose on the Property, and

that Wells Fargo was accelerating her loan.  (Id. ¶ 46).  Harmon is a Massachusetts

Professional Corporation that is engaged in the practice of law, and it was acting as

counsel to Wells Fargo when it sent the April 22 letter to Akar.  (See id. ¶ 19).  The

plaintiffs claim that at the time of the letter, both Harmon and Wells Fargo knew or

should have known that there had been no valid assignment of the mortgage to Wells

Fargo.  (Id. ¶ 46).  Nevertheless, on about April 23, 2008, Harmon, acting on behalf of

Wells Fargo, filed a Complaint to Foreclose Mortgage in the Massachusetts Land Court

Department of the Trial Court for purposes of foreclosing on the Property.[6]  (See id.

¶¶ 3A, 47; Def. Ex. A).[7]

The Land Court complaint was filed pursuant to the Servicemembers Civil Relief

Act, and it provided that Wells Fargo was "the assignee and holder of a mortgage with the

statutory power of sale given by Sabah Akar to [MERS] dated August 25, 2006[.]"

(Compl., Ex. 3).  However, the complaint contained no specific reference to an

assignment of the mortgage to Wells Fargo.  (Compl. ¶ 47 and Ex. 3 thereto).  The

plaintiffs allege that at the time the complaint was filed with the Land Court, the

_____

[6]  The plaintiffs allege that the Land Court complaint was filed by "Harmon or Northeast
Abstract[.]" (Compl. ¶ 47).  However, the complaint shows that it was filed by an attorney from
Harmon, and makes no reference to Northeast Abstract.  (See Ex. A attached to "Defendants
Harmon Law Offices, P.C.'s and Northeast Abstract Company Inc.'s Memorandum in Support of
Their Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)" (Docket No. 45) ("Def. Mem.")).

[7]  "Def. Ex. A" refers to the Land Court complaint attached as Exhibit A to the
defendants' memorandum.  Because the Land Court complaint is specifically referenced in and
incorporated into the complaint, this court may consider it on a motion to dismiss.  See Alt.
Energy, Inc., 267 F.3d at 33.

defendants knew or should have known that there had been no valid assignment of the mortgage to Wells Fargo. (Compl. ¶¶ 49, 62). They also allege that because there had been no valid assignment, the documents filed with the Land Court were "false and deceiving." (See id. ¶ 3A).

The plaintiffs contend that Akar subsequently made various attempts to avoid foreclosure. In particular, they allege that she requested a temporary forbearance of her mortgage obligations from Wells Fargo so that she could pursue the sale of the Property. (Id. ¶ 66). They also allege that Akar requested a moratorium or loan modification from Wells Fargo, and that she submitted a proposal for a short sale of the Property to Wells Fargo. (Id. ¶¶ 67-70). According to the plaintiffs, Wells Fargo rejected Akar's requests for a forbearance or restructuring of the loan. (Id. ¶¶ 66, 68). Moreover, although the defendant ultimately approved Akar's short sale proposal, the plaintiffs claim that Wells Fargo's delay in completing its approval process caused the short sale to fall through and deprived Akar of an opportunity to avoid foreclosure. (See id. ¶¶ 69-78). However, the plaintiffs do not allege that Harmon or Northeast Abstract participated in any of the negotiations between Akar and Wells Fargo, or advised Wells Fargo on any of these matters.

On August 22, 2008, the Land Court issued a notice to Akar informing her of Wells Fargo's pending complaint in the Land Court. (See Compl., Ex. 4). The notice provided in relevant part that Wells Fargo, "claiming to be the holder of a Mortgage" covering the Property, had filed a complaint for authority to foreclose on the mortgage,

and that Akar had a right to object to such foreclosure if she was "entitled to the benefits of the Servicemembers Civil Relief Act as amended[.]" (Id.). The plaintiffs allege that at the time the Land Court issued the notice, both Harmon and Wells Fargo knew or should have known that Wells Fargo had no valid assignment of the mortgage, and therefore lacked the legal authority to foreclose on the Property. (See Compl. ¶¶ 50, 62).

Subsequently, on about September 18, 2008, Harmon, acting as the attorney for Wells Fargo, sent Akar a "Notice of Intention to Foreclose Mortgage and of Deficiency After Foreclosure of Mortgage." (Id. ¶ 52 and Ex. 5 thereto). Therein, Harmon informed Akar of "the intention of Wells Fargo Bank, NA, on or after October 21, 2008, to foreclose by sale under power of sale for breach of conditions, the mortgage held by it" on the Property. (Compl., Ex. 5 at 2). Although Harmon stated that Wells Fargo was the present holder of the mortgage, it provided no specific reference to an assignment of the mortgage to Wells Fargo. (Compl. ¶ 52 and Ex. 5 thereto). In any event, no foreclosure sale of the Property occurred on October 21, 2008. (See Compl.¶ 59).

The record shows that on September 22, 2008, MERS assigned Akar's mortgage to Wells Fargo by executing an Assignment of Mortgage in favor of the defendant. (Compl. ¶ 63 and Ex. 9 thereto). The Assignment was recorded in the Norfolk County Registry of Deeds on September 24, 2008. (Compl., Ex. 9).

On October 15, 2008, the Land Court rendered a judgment on Wells Fargo's Complaint to Foreclose Mortgage. (Compl., Ex. 3). Therein, the Land Court determined that Akar was not entitled to the benefits of the Servicemembers Civil Relief Act. (Id.).

Accordingly, the Court ordered that Wells Fargo "be authorized and empowered to make an entry and to sell the property covered by the mortgage . . . in accordance with the powers contained in said mortgage." (Id.).

The plaintiffs allege that Akar submitted a loan modification request to Wells Fargo on December 19, 2008. (Compl. ¶ 79). Following the submission, Akar's counsel made numerous calls to Wells Fargo to check on the status of the application. (Id. ¶ 80). According to the plaintiffs, Akar's counsel was told repeatedly that the file was under review, and that the reviewer was aware of the pending foreclosure. (Id. ¶ 80). The plaintiffs do not allege that Harmon or Northeast Abstract were involved in these discussions or that they had any knowledge of them.

On about January 8, 2009, Harmon, acting in its capacity as the attorney to Wells Fargo, sent Akar a second "Notice of Intention to Foreclose Mortgage and of Deficiency After Foreclosure of Mortgage." (Id. ¶ 53 and Ex. 6 thereto). Therein, Harmon informed the plaintiff of Wells Fargo's intent to foreclose on the Property, pursuant to the statutory power of sale, on or after February 10, 2009. (Compl., Ex. 6 at 2). It also stated that Wells Fargo was the present holder of the mortgage, but provided no specific reference to the assignment of the mortgage to Wells Fargo. (Compl. ¶ 53 and Ex. 6 thereto). As detailed above, Wells Fargo had obtained an assignment of the mortgage from MERS by the time Harmon sent the second Notice to Akar in January 2009.

In its capacity as counsel to Wells Fargo, Harmon also arranged for a Notice of Mortgagee's Sale of Real Estate to be published in the Stoughton Journal on January 16,

23 and 30, 2009. (Compl. ¶ 56 and Ex. 7 thereto). The Notice identified Wells Fargo as the holder of the mortgage for the Property, and provided that a public auction of the Property would take place on February 10, 2009 for the purpose of foreclosure. (Id.). The plaintiffs contend that as a result of the publication of the Notice in the newspaper, and the defendants' listing of the Property on a website of "bank-owned" property, numerous individuals entered the Property without permission, took photographs and peered into the windows of Akar's home. (Id. ¶¶ 174-76). They also allege that on more than one occasion, individuals rang the doorbell and asked to enter the home. (Id. ¶ 176).

On about January 21, 2009, Harmon allegedly sent Akar a letter in which it offered the plaintiff "certain opportunities to avoid foreclosure," including an opportunity to seek a loan modification. (Id. ¶ 57). At that time, however, Akar's application for a loan modification had already been submitted to Wells Fargo. (See id. ¶¶ 79-80). Accordingly, Harmon was notified that the matter was pending before Wells Fargo. (Id. ¶ 57).

The plaintiffs claim that Wells Fargo mishandled Akar's application for a loan modification, and that Wells Fargo representatives repeatedly made false representations, on which Akar relied, that the foreclosure sale scheduled for February 10, 2009 would be postponed if no decision had been made on Akar's application. (See id. ¶¶ 79-85, 121). However, the plaintiffs have alleged no facts indicating that Harmon or Northeast Abstract had any involvement with Akar's loan modification application. Nor have they

alleged any facts which would indicate that Harmon or Northeast Abstract was

responsible for any statements regarding the postponement of the foreclosure sale.

### The Foreclosure and its Aftermath

Despite Wells Fargo's alleged representations, a foreclosure sale of the Property

took place on February 10, 2009, pursuant to the statutory power of sale, even though

Akar's application for a loan modification remained pending.  (Id. ¶¶ 59, 84).  The

plaintiffs claim that Harmon was responsible for carrying out the sale on behalf of Wells

Fargo, and that Wells Fargo purchased the Property itself for $335,647.09, which was

less than its fair market value.  (Id. ¶¶ 59-60).

The plaintiffs also allege that in connection with the foreclosure sale, an attorney

for Wells Fargo entered the Property pursuant to a Certificate of Entry, but without

permission from Akar.  (Id. ¶¶ 61,177).  Allegedly, the Certificate of Entry provided that

Wells Fargo was the current holder of the mortgage for the Property, but made no

reference to an assignment of the mortgage to Wells Fargo.  (Id. ¶ 61).  Notwithstanding

their allegations regarding the assignment of the mortgage to Wells Fargo in September

2008, the plaintiffs contend that Wells Fargo had no "validly assigned mortgage and

therefore no valid right of entry under a power of sale."  (Id. ¶ 177).

Allegedly, Wells Fargo transferred ownership of the Property to Fannie Mae on

February 20, 2009.  (Id. ¶ 59).  On February 26, 2009, plaintiffs' counsel allegedly

contacted Harmon to inform it that an independent third party was interested in

purchasing the Property.  (Id. ¶ 86).  However, on April 15, 2009, Harmon notified Akar

that Fannie Mae was presently unwilling to entertain any offers to purchase the Property, and that it did not intend to place the Property on the market until it was vacant. (Id. ¶ 87). Shortly thereafter, on April 27, 2009, the plaintiffs were served with a 72 Hour Notice to Quit and Vacate the Premises, which was signed by an attorney at Harmon. (Id. ¶ 88).

Akar continued to negotiate with Harmon and Fannie Mae concerning the possibility of selling the Property to an independent third party. (Id. ¶ 89). As of October 2009, when the third-party offer was submitted, the Property allegedly had an appraised value of $280,000. (Id. ¶ 91). However, the plaintiffs claim that Fannie Mae refused to sell the Property for less than the full amount owed on the loan, which was $361,831.49 as of December 10, 2009. (Id. ¶ 89). According to the plaintiffs, neither Wells Fargo nor Fannie Mae has explained the basis for Fannie Mae's assertion as to the amount that remains owing on the loan. (Id. ¶ 90).

Additional factual details relevant to this court's analysis are provided below where appropriate.

### III. ANALYSIS

Harmon and Northeast Abstract have moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss each of the claims asserted against them in the Second Amended Verified Complaint. Those claims include claims against both defendants for wrongful foreclosure in violation of Mass. Gen. Laws ch. 244, § 14 and the duty of good faith and reasonable diligence (Counts III-IV), wrongful foreclosure based on bad faith (Count

VII), intentional infliction of emotional distress (Count XI), and unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A (Count XII). They also include claims against Harmon for violation of the Fair Debt Collection Practices Act (Count II) and civil trespass (Count X). For the reasons that follow, this court recommends that all of these claims be dismissed, except for Count II against Harmon under the Fair Debt Collection Practices Act.

A.    <u>**Standard of Review**</u>

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the non-moving party. <u>Cooperman</u>, 171 F.3d at 46. Dismissal is only appropriate if the pleadings, so viewed, fail to support "'a plausible entitlement to relief.'" <u>Rodriguez-Ortiz v. Margo Caribe, Inc.</u>, 490 F.3d 92, 95 (1st Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief. <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 268 (1st Cir. 2009). "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.'" <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)) (internal citations

omitted).  "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.'"  Id. (quoting Ashcroft, 129 S. Ct. at 1950).  "This second principle recognizes that the court's assessment of the pleadings is 'context-specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.'  '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief.'"  Id. (quoting Ashcroft, 129 S. Ct. at 1950) (internal quotations and citation omitted; alterations in original).

**B.     Count II: Alleged Violation of the Fair Debt Collection
         Practices Act Against Harmon**

In Count II, the plaintiffs are seeking to hold Harmon liable under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA").  That statute "prohibits 'debt collector[s]' from making false or misleading representations and from engaging in various abusive and unfair practices."  Heintz v. Jenkins, 514 U.S. 291, 292, 115 S. Ct. 1489, 1490, 131 L. Ed. 2d 395 (1995) (alteration in original).  The plaintiffs claim that Harmon is a debt collector within the meaning of the FDCPA, and that it violated several provisions of the FDCPA "[b]y sending communications on behalf of an entity that was not the proper holder of an assignment at that time[.]"  (Compl. ¶¶ 98, 102-04).

Harmon has moved to dismiss this claim on the ground that it is barred by the litigation privilege.  Additionally, Harmon contends that the FDCPA claim must fail because its communications were proper, and because the foreclosure was legally valid.

-15-

For the reasons that follow, Harmon's arguments do not support the dismissal of the plaintiffs' claim against it under the FDCPA. Accordingly, this court recommends that the motion to dismiss be denied with respect to Count II.

## Application of the Litigation Privilege

Harmon argues, as an initial matter, that it is protected from liability under the FDCPA by the litigation privilege. That privilege provides "'that statements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding.'" Visnick v. Caulfield, 73 Mass. App. Ct. 809, 812, 901 N.E.2d 1261, 1263 (2009) (quoting Sriberg v. Raymond, 370 Mass. 105, 108, 345 N.E.2d 882 (1986)). "'The [litigation] privilege extends to circumstances where the statements are made preliminary to a proposed or contemplated judicial proceeding as long as they bear some relation to the proceeding.'" Id. at 812, 901 N.E.2d at 1264 (quoting Fisher v. Lint, 69 Mass. App. Ct. 360, 366, 868 N.E.2d 161 (2007)). Moreover, it applies "even if the offensive statements are uttered maliciously or in bad faith[,]" and it "immunizes the maker of the statements from any civil liability arising from those statements." Encompass Ins. Co. of Mass. v. Giampa, 522 F. Supp. 2d 300, 308 (D. Mass. 2007) (quotations and citations omitted).

While the litigation privilege may be relied on to bar state common law claims based on statements that relate to judicial proceedings, Harmon has not shown that it can be invoked to preclude claims under the FDCPA. Cf. Visnick, 73 Mass. App. Ct. at 813, 901 N.E.2d at 1264-65 (finding that litigation privilege barred common law claims). "All

-16-

circuits to consider the issue, except for the Eleventh, have recognized the general principle that the FDCPA applies to the litigation activities of attorneys who qualify as debt collectors under the statutory definition." Sayyed v. Wolpoff & Abramson, 485 F.3d 226, 232 (4th Cir. 2007) (citing cases). Additionally, "[t]he statutory text makes clear that there is no blanket common law litigation immunity from the requirements of the FDCPA." Id. at 230. See also Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 369 (3d Cir. 2011) (finding that "the FDCPA does not contain an exemption from liability for common law privileges[,]" and that a state law "litigation privilege does not absolve a debt collector from liability under the FDCPA"). Accordingly, Harmon has not demonstrated that the litigation privilege warrants the dismissal of the plaintiffs' claim against it under the FDCPA.

### Harmon's Remaining Arguments

Harmon argues that Count II nevertheless must be dismissed because the communications at issue were proper. In particular, Harmon contends that any communications it sent to Akar prior to the assignment of the mortgage to Wells Fargo "predate the decision rendered by the Land Court in *U.S. Bank Nat'l Ass'n v. Ibanez*, 2009 WL 795201 (Land Court, 2009)." (Def. Mem. (Docket No. 45) at 10). In that case the Land Court held that foreclosure sales were invalid because neither of the foreclosing entities "had been assigned the mortgages at the time notice was published and sale took place." U.S. Bank Nat'l Ass'n, 2009 WL 795201, at *2. Harmon argues that prior to Ibanez, "as a general practice, assignments of mortgage were routinely executed after the

-17-

foreclosure sale was conducted[.]" (Def. Mem. at 10). Therefore, Harmon asserts, its communications were proper and cannot give rise to a claim of misrepresentation under the FDCPA.

Harmon's argument is unpersuasive. The issue raised by the plaintiffs' claim under the FDCPA is not whether the communications at issue were consistent with common practice or not clearly unlawful under Massachusetts law at the time they were sent. Rather, the issue is whether those communications, through which Harmon allegedly was attempting to collect a debt on behalf of an entity that had not yet been assigned the mortgage, violated the provisions of the FDPCA. Because the defendant has not attempted to address that issue, it has not shown that the claim should be dismissed at this stage in the litigation.[8]

Harmon's argument that the foreclosure sale was valid is similarly insufficient to support the dismissal of Count II. The question whether the foreclosure itself was proper under Massachusetts law relates to the plaintiffs' wrongful foreclosure claims, not their claim under the FDCPA. The essence of the plaintiffs' claim under the FDCPA is that

---

[8] Contrary to Harmon's assertion, the fact that the challenged communications preceded the Land Court's decision in Ibanez does not establish that those communications were proper. It has long been the rule in Massachusetts that an assignment is necessary in order to transfer title to a mortgage. See Warden v. Adams, 15 Mass. 233, 236 (1818) ("By force of our statutes regulating the transfer of real estates and for preventing frauds, no interest passes by a mere delivery of a mortgage deed, without an assignment in writing and by deed."). See also Barnes v. Boardman, 149 Mass. 106, 114, 21 N.E. 308, 309 (1889) (explaining that assignment of the note without assignment of the mortgage does not transfer title to the mortgage). Therefore, the plaintiffs have stated a claim that Harmon misrepresented the identity of the mortgage holder when it sent communications to Akar prior to the assignment of the mortgage to Wells Fargo.

Harmon's communications to Akar regarding Wells Fargo's intent to foreclose on the mortgage violated the statute because they occurred prior to the assignment of the mortgage to Wells Fargo and misrepresented the identity of the mortgage holder. Even if the foreclosure sale were valid (as this court has found for the reasons detailed infra), that would not negate the fact that Harmon allegedly made misrepresentations, at certain times prior to the foreclosure sale, regarding Wells Fargo's ownership of the mortgage. Nor would it negate the fact that the plaintiffs may be entitled to damages even if the subsequent foreclosure was proper because eventually the defendants got their paperwork in order. Accordingly, the plaintiffs have stated a claim against Harmon for violation of the FDCPA, and this court recommends that the motion to dismiss Count II of the complaint be denied.

**C.    Counts III, IV and VII: Claims for Wrongful Foreclosure
        Against Harmon and Northeast Abstract**

In Counts III, IV and VII of their complaint, the plaintiffs have asserted claims against Harmon and Northeast Abstract for wrongful foreclosure. Specifically, in Count III, they claim that "Harmon/Northeast Abstract" conducted an unlawful foreclosure sale of the Property because neither Wells Fargo nor Harmon possessed a written assignment of Akar's mortgage at the time the foreclosure proceedings commenced. (See Compl. ¶¶ 107-112). Similarly, in Count IV, the plaintiffs claim that "Harmon/Northeast Abstract" breached a duty of good faith and reasonable diligence by commencing the foreclosure proceedings before there was a valid assignment of the mortgage to Wells

Fargo, (see id. ¶¶ 114-119), and in Count VII, they claim that the foreclosure sale was conducted in bad faith because it was "wrongful under Massachusetts law[.]" (Id. ¶ 144). As described below, this court finds that the claims against Northeast Abstract should be dismissed because the plaintiffs have not alleged any facts implicating that defendant in the challenged foreclosure proceedings. This court also finds that because Wells Fargo had the legal authority to foreclose on the Property on February 10, 2009, the plaintiffs' wrongful foreclosure claims against Harmon must fail as well.[9]

## Lack of Allegations Against Northeast Abstract

This court finds, as an initial matter, that the plaintiffs have failed to state a claim against Northeast Abstract because they have not alleged any facts indicating that Northeast Abstract had any involvement in the foreclosure proceedings. In particular, the plaintiffs have not alleged that Northeast Abstract engaged in any communications with Akar regarding Wells Fargo's intent to foreclose on the Property, and they have not alleged any facts showing that Northeast Abstract was responsible for publicizing the foreclosure sale or carrying it out. Although the plaintiffs do claim that "Harmon or Northeast Abstract Company, Inc." was responsible for filing the complaint in the Land Court pursuant to the Servicemembers Civil Relief Act, (see Compl. ¶ 47), the Land

---

[9] Because this court finds that the wrongful foreclosure claims against Harmon should be dismissed on the grounds that the foreclosure sale was valid, it is unnecessary to address the defendants' argument that Count IV also should be dismissed because Harmon owed no legal duty to Akar or the remaining plaintiffs, or their argument that Count VII should be dismissed because the plaintiffs failed to meet the applicable pleading standard and because the claim against Harmon is barred by the litigation privilege. (See Def. Mem. at 12-14).

Court complaint shows that it was filed by an attorney from Harmon, but makes no reference to Northeast Abstract.  (See Def. Ex. A).  Moreover, the plaintiffs' conclusory allegation that "Harmon/Northeast Abstract" conducted the foreclosure sale, without more, is insufficient to implicate Northeast Abstract in the foreclosure proceedings.  See Maldonado, 568 F.3d at 268 ("conclusory statements are 'not entitled to the assumption of truth'" (quoting Ashcroft, 129 S. Ct. at 1949)).

In a footnote contained in the complaint, the plaintiffs state as follows:

> Harmon and Northeast Abstract appear to be affiliated and either (i) the alter-ego of each other, or (ii) in an incestuous business relationship; both are controlled by Mark P. Harmon according to documents filed with the Massachusetts Secretary of State.  The recorded documents contain stamped information identifying both Harmon and Northeast Abstract, so it is impossible to identify the responsible party without further discovery.

(Compl. ¶ 47 n.6).  However, there are no facts set forth in the body of the complaint to substantiate the plaintiffs' suggestion that the defendants are "alter-ego[s] of each other" or are involved in any kind of "incestuous" relationship.  Nor have the plaintiffs identified any documents that identify Northeast Abstract as having been involved in the foreclosure of the Property.  Accordingly, this court recommends that the wrongful foreclosure claims asserted against Northeast Abstract in Counts III, IV and VII be dismissed.

### Validity of the Foreclosure Under the Statutory Power of Sale

Harmon argues that the wrongful foreclosure claims against it also must fail because there was a valid foreclosure of the Property pursuant to the statutory power of sale. This court agrees for the reasons that follow.

"Where a mortgage grants a mortgage holder the power of sale, as did . . . the [Akar] mortgage[], it includes by reference the power of sale set out in G.L. c. 183, § 21, and further regulated by G.L. ch. 244, §§ 11-17C." U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 646, 941 N.E.2d 40, 49 (2011). Pursuant to the statutory scheme,

> after a mortgagor defaults in the performance of the underlying note, the mortgage holder may sell the property at a public auction and convey the property to the purchaser in fee simple, "and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity."

Id. (quoting Mass. Gen. Laws ch. 183, § 21). Due to the "substantial power that the statutory scheme affords to a mortgage holder to foreclose without immediate judicial oversight," Massachusetts law requires that "'one who sells under a power [of sale] must follow strictly its terms. If he fails to do so there is no valid execution of the power, and the sale is wholly void.'" Id. at 646, 941 N.E.2d at 49-50 (quoting Moore v. Dick, 187 Mass. 207, 211, 72 N.E. 967, 968 (1905)) (alteration in original).

"One of the terms of the power of sale that must be strictly adhered to is the restriction on who is entitled to foreclose." Id. at 647, 941 N.E.2d at 50. Under Mass. Gen. Laws ch. 183, § 21, "[t]he 'statutory power of sale' can be exercised by 'the

mortgagee or his executors, administrators, successors or assigns.'" Id. (quoting Mass.

Gen. Laws. ch. 183, § 21).  Similarly, under Mass. Gen. Laws ch. 244, § 14,

> "[t]he mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person" is empowered to exercise the statutory power of sale.  Any effort to foreclose by a party lacking "jurisdiction and authority" to carry out a foreclosure under these statutes is void.

Id. (quoting Mass. Gen. Laws ch. 244, § 14) (alteration in original).  Thus, "only a

present holder of the mortgage is authorized to foreclose on the mortgaged property[.]"

Id. at 648, 941 N.E.2d at 50.

"A related statutory requirement that must be strictly adhered to in a foreclosure

by power of sale is the notice requirement articulated in G.L. c. 244, § 14." Id. at 647,

941 N.E.2d at 50.  Pursuant to that provision,

> "no sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale," advance notice of the foreclosure sale has been provided to the mortgagor, to other interested parties, and by publication in a newspaper published in the town where the mortgaged land lies or of general circulation in that town.

Id. (quoting Mass. Gen. Laws ch. 244, § 14).  "Because only a present holder of the

mortgage is authorized to foreclose on the mortgaged property, and because the

mortgagor is entitled to know who is foreclosing and selling the property," the holder of

the mortgage must be identified in the notice of sale, and any failure to do so "may render

. . . the foreclosure sale void." Id. at 648, 941 N.E.2d at 50.  The key, therefore, "is that

the foreclosing entity must hold the mortgage at the time of the notice and sale in order

accurately to identify itself as the present holder in the notice and in order to have the authority to foreclose under the power of sale . . . ." <u>Id.</u> at 651, 941 N.E.2d at 53.

In the instant case, the plaintiffs have alleged that Wells Fargo was the holder of Akar's mortgage at the time of the notice and subsequent foreclosure sale of the Property. Specifically, the plaintiffs allege that Akar's mortgage was assigned to Wells Fargo on September 22, 2008 and recorded on September 24, 2008. (Compl. ¶ 63 and Ex. 9 thereto). They also allege that subsequent to the assignment, in January 2009, Harmon notified Akar of Wells Fargo's intent to foreclose on the Property on February 10, 2009 by way of a public auction. (Compl., Ex. 6). Harmon also arranged for notices of the foreclosure auction to be published in the local newspaper. (Compl. ¶ 56 and Ex. 7). Those notices properly identified Wells Fargo as the holder of the mortgage for the Property. (Compl., Ex. 7).

As described above, "Massachusetts law requires only that the assignment of mortgage be executed and recorded prior to the publication of the notice of sale." <u>Kiah v. Aurora Loan Servs., LLC</u>, Civil Action No. 10-40161-FDS, 2011 WL 841282, at *6 (D. Mass. Mar. 4, 2011). Because Wells Fargo had a valid assignment of Akar's mortgage at the time of the notice of sale, it had the authority to conduct the foreclosure sale on February 10, 2009 under Massachusetts law, and Harmon cannot be held liable for wrongful foreclosure.[10]

---

[10] The fact that Harmon sent Akar the first Notice of Wells Fargo's intent to foreclose prior to the assignment of the mortgage from MERS to Wells Fargo does not alter this court's

## Impact of the Land Court Proceedings
## on the Validity of the Foreclosure Sale

The fact that Harmon filed a Complaint to Foreclose Mortgage in the Land Court in April 2008 does not alter this court's conclusion that the foreclosure proceedings were valid. The Land Court proceeding was filed pursuant to the Servicemembers Civil Relief Act ("Servicemembers Act"), "which restricts foreclosures against active duty members of the uniformed services." U.S. Bank Nat'l Ass'n, 458 Mass. at 642, 941 N.E.2d at 47. Under Massachusetts law, "actions taken to comply with the [Servicemembers Act] . . . are not in themselves mortgage foreclosure proceedings in any ordinary sense. Rather, they occur independently of the actual foreclosure itself and of any judicial proceedings determinative of the general validity of the foreclosure." Beaton v. Land Court, 367 Mass. 385, 390, 326 N.E.2d 302, 305 (1975). See also U.S. Bank Nat'l Ass'n, 458 Mass. at 642 n.13, 941 N.E.2d at 47 n.13 (explaining that "a mortgage holder is required to go to court to obtain a judgment declaring that the mortgagor is not a beneficiary of the Servicemembers Act before proceeding to foreclosure" (emphasis added)). As the Supreme Judicial Court of Massachusetts has further explained, the Servicemembers Act, as amended,

---

conclusion that the foreclosure proceedings were valid. As detailed herein, no foreclosure sale occurred on October 21, 2008 pursuant to that Notice. Furthermore, after Wells Fargo obtained the assignment from MERS, the defendants began the foreclosure proceedings anew by issuing Akar a new Notice of Wells Fargo's intent to foreclose and by publicizing the February 10, 2009 foreclosure sale in the local newspaper. (See Compl. ¶¶ 53, 56 and Exs. 6 and 7 thereto).

> simply establishes procedures whereby mortgagees, in addition to taking all steps necessary to foreclose, can make certain that there will be no cloud on the title following the foreclosure as a result of an interested party having been in, or just released from, military service and thus under the protective umbrella of the [Servicemembers Act]. If a foreclosure were otherwise properly made, failure to comply with the [Servicemembers Act] would not render the foreclosure invalid as to anyone not entitled to the protection of that act.

Beaton, 367 Mass. at 390, 326 N.E.2d at 305 (citations omitted). Accordingly, the Land Court action did not mark the commencement of foreclosure proceedings, and the fact that Wells Fargo did not obtain a valid assignment of Akar's mortgage until September 2009, five months after the Land Court action was filed, does not render the foreclosure sale unlawful.

### D. Count X: Trespass Claim Against Harmon

In Count X, the plaintiffs are seeking to hold Harmon liable for civil trespass. Specifically, the plaintiffs claim that Harmon committed the alleged trespass on February 10, 2009, when its representative entered the Property to conduct the foreclosure sale "without having a validly assigned mortgage and therefore no valid right of entry under a power of sale." (Compl. ¶ 177). Additionally, they claim that Harmon should be held liable for trespass because its actions in advertising the foreclosure sale in the newspaper and listing the Property on a "bank-owned" website, even though the mortgage had not been assigned to Wells Fargo, "caused numerous individuals to enter upon the [Property] on or before February 10, 2009 purportedly to inspect the [Property]." (Compl. ¶¶ 174-

76).  This court recommends that Harmon's motion to dismiss be allowed with respect to this claim.

"To support an action of trespass . . . it is necessary to prove the actual possession of the plaintiff, and an illegal entry by the defendant."  New England Box Co. v. C&R Constr. Co., 313 Mass. 696, 707, 49 N.E.2d 121, 128 (1943) (quotations and citations omitted).  As described above with respect to the plaintiffs' wrongful foreclosure claims, Wells Fargo had a valid assignment of the mortgage and the legal authority to conduct the foreclosure sale February 10, 2009 under Massachusetts law.  Therefore, Harmon's entry onto the Property for the purpose of carrying out the sale on behalf of Wells Fargo was legal and did not constitute a trespass.  Furthermore, under Massachusetts law, Wells Fargo was required to provide advance notice of the foreclosure sale, and to publish such notice in the newspaper.  See U.S. Bank Nat'l Assoc., 458 Mass. at 647, 941 N.E.2d at 50 (describing statutory notice requirements set forth in Mass. Gen. Laws ch. 244, § 14).  Accordingly, Harmon's actions in advertising the foreclosure sale were legal and do not support a claim for trespass based on the theory that its advertisements on behalf of Wells Fargo caused third parties to enter onto the Property.

### E.    Count XI: Claim for Intentional Infliction of Emotional Distress Against Harmon and Northeast Abstract

Harmon and Northeast Abstract also have moved to dismiss the plaintiffs' claims, asserted in Count XI of the complaint, for intentional infliction of emotional distress.  In order to state a claim for intentional infliction of emotional distress, the plaintiffs must

allege "'(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff[s'] distress; and (4) that the plaintiff[s] suffered severe distress.'" O'Neil v. DaimlerChrysler Corp., 538 F. Supp. 2d 304, 320 (D. Mass. 2008) (quoting Sena v. Commonwealth, 417 Mass. 250, 263-64, 629 N.E.2d 986, 993 (1994)). Moreover, "'[t]o be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community. Liability cannot be founded upon mere insults, threats, or annoyances.'" Id. (quoting Sena, 417 Mass. at 264, 629 N.E.2d at 993). This court finds that the plaintiffs have failed to state such a claim against either of the defendants.

With respect to Northeast Abstract, this court finds that the plaintiffs have failed to allege any facts that would support a claim against that defendant for intentional infliction of emotional distress. As described above, the plaintiffs have not alleged any facts implicating Northeast Abstract in the foreclosure proceedings. Nor have they alleged any facts to suggest that Northeast Abstract participated in any other conduct that could have caused the plaintiffs to suffer emotional distress. Therefore, this court recommends that the claim asserted against Northeast Abstract in Count XI be dismissed. The plaintiffs' claim against Harmon is similarly insufficient to survive the defendants' motion to dismiss. As set forth above, in order to state claim for intentional infliction of emotional distress, a plaintiff must allege facts showing that "the defendant intended to cause, or should have known that his conduct would cause, emotional distress[.]"

O'Neil, 538 F. Supp. 2d at 320 (quotations and citation omitted).  Here, the plaintiffs

have alleged that "[t]he conduct of the Defendants was intentional and reckless in that

they knew or should have known that they did not have proper title or the right to conduct

a foreclosure auction on the [Property]."  (Compl. ¶ 182).  Because the foreclosure sale

was valid, and the defendants did have the right to conduct the foreclosure auction, the

plaintiffs' allegations are insufficient to support their claim that Harmon intended to

cause emotional distress.[11]  Accordingly, this court recommends that Count XI against

Harmon be dismissed as well.[12]

### F.    Count XII:Claim Against Harmon and Northeast Abstract for Unfair and Deceptive Trade Practices Under Mass. Gen. Laws ch. 93A

In Count XII of their complaint, the plaintiffs claim that Harmon and Northeast

Abstract, "[b]y engaging in the conduct complained of in this complaint, . . . engaged in

---

[11]  Even if the plaintiffs had alleged that Harmon intended to cause emotional distress, they have not alleged any facts showing that Harmon's conduct was "'beyond all bounds of decency and ... utterly intolerable in a civilized community.'"  O'Neil, 538 F. Supp. 2d at 320 (quoting Sena, 417 Mass. at 264, 629 N.E.2d at 993).  At most, the plaintiffs have alleged that Harmon notified Akar of Wells Fargo's intent to foreclose on the Property at a time when Wells Fargo had not yet become the holder of Akar's mortgage.  "Though the defendant may have engaged in some legally cognizable wrongdoing, and though the [plaintiffs] may have suffered greatly, there is no indication that the defendant's actions were extreme and outrageous."  Alpino v. JPMorgan Chase Bank, Nat'l Ass'n, Civil No. 1:10-12040-PBS, 2011 WL 1564114, at *8 (D. Mass. Apr. 21, 2011) (slip op.) (dismissing claim for intentional infliction of emotional distress based on defendant's failure to consider plaintiff for a mortgage modification and failure to conduct an open and fair foreclosure sale).

[12]  In light of this court's conclusion that the plaintiffs have failed to allege a requisite element of their claim for intentional infliction of emotional distress against Harmon, it is unnecessary to evaluate whether they also have failed to state a claim because the litigation privilege protects Harmon from liability arising from its alleged actions in connection with non-judicial foreclosure proceedings conducted pursuant to the statutory power of sale.

unfair and deceptive acts or practices in violation of [Mass. Gen. Laws] c. 93A §§ 2 and 9." (Compl. ¶ 187). This court finds that the plaintiffs have failed to state a claim against Harmon or Northeast Abstract under Mass. Gen. Laws ch. 93A.

Harmon argues that the plaintiffs' claim against it under Chapter 93A must fail because "Harmon's conduct in this matter does not constitute 'trade or commerce' within the meaning of the statute." (Def. Mem. at 17). This court agrees. Chapter 93A prohibits "'unfair or deceptive acts or practices in the conduct of any trade or commerce.'" Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 439, 689 N.E. 2d 774, 778 (1998) (quoting Mass. Gen. Laws ch. 93A, § 2(a)). "A party is engaging in 'trade or commerce,' as required under c. 93A, when it acts in a 'business context.'" Id. (quoting Lantner v. Carson, 374 Mass. 606, 611, 373 N.E.2d 973 (1978)). Thus, "Chapter 93A claims can be brought against an attorney or a law firm," but only when the attorney or law firm is "acting in a business context vis-a-vis the plaintiffs." Tomaselli v. Beaulieu, Civil Action No. 08-CV-10666-PBS, 2010 WL 2105347, at *8 (D. Mass. May 7, 2010) (slip op.).

In the instant case, there was no business relationship between the plaintiffs and Harmon. Rather, "the only contact between the parties was on opposing sides of a dispute" involving the foreclosure of Akar's Property by Harmon's client, Wells Fargo. Id. "This 'interaction alone is insufficient to warrant a finding of a commercial relationship.'" Id. (quoting Law Offices of Jeffrey S. Glassman v. Palmisciano, No. 07-

10306-DPW, 2009 WL 5258176, at *13 (D. Mass. Dec. 29, 2009)).  Therefore, the plaintiffs have failed to state a claim against Harmon under Chapter 93A.

Because the plaintiffs have not identified any conduct by Northeast Abstract that could give rise to a claim against it under Chapter 93A, the plaintiffs' claim against that defendant should be dismissed as well.  In order to state a claim under Chapter 93A, "some form of deceptive or unfair conduct must be alleged."  States Res. Corp. v. The Architectural Team, Inc., 433 F.3d 73, 84 (1st Cir. 2005).  "'[A] practice or act will be unfair under [Chapter 93A] if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.'"  Morrison v. Toys "R" Us, Inc., 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004) (quoting Heller Fin. v. Ins. Co. of N. Am., 410 Mass. 400, 408, 573 N.E.2d 8 (1991)).  "A practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted."  Duclersaint v. Fed. Nat'l Mortg. Ass'n, 427 Mass. 809, 814, 696 N.E.2d 536, 540 (1998).  Here, however, the plaintiffs have not alleged any facts indicating that Northeast Abstract was even involved in the circumstances giving rise to this litigation.  Accordingly, they have failed to allege that Northeast Abstract engaged in any unfair or deceptive conduct in violation of Chapter 93A.

# IV. **CONCLUSION**

For all the reasons described above, this court recommends to the District Judge to whom this case is assigned that "Defendants, Harmon Law Offices, P.C.'s and North East Abstract Company Inc.'s Motion [to] Dismiss Under Fed. R. Civ. P. 12(b)(6)" (Docket No. 44) be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that the motion be denied with respect to Count II, in which the plaintiffs have asserted a claim against Harmon under the Fair Debt Collection Practices Act, but that the motion otherwise be allowed.[13]


　　/ s / Judith Gail Dein　　　　　　　
Judith Gail Dein
U.S. Magistrate Judge

---

[13] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).